We'll begin with 19-1384 Weiss v. Banner Health. Mr. Bulger, you may proceed. Good morning, your honors. My distinguished colleague, Mr. Herdy. I'm pleased with the court. I'm here to present argument on behalf of the appellant and cross appellee in this matter, Ms. Jennifer Weiss. Ms. Weiss is one of our brave first responders, a former nurse employed at sued against Banner for the improper denial of medical benefits. It is, I believe, agreed upon between the parties and as the district court found, the medical benefits at issue were provided through an employer-sponsored benefit plan and is therefore governed by the Employee Retirement Income Security Act of 1974, commonly referred to as ERISA. In this particular case, your honors, the medical procedure in dispute is referred to throughout the briefing as an ACI, which is an autologous chondrocyte implantation. The procedure was described by Dr. James Court, a Banner-employed orthopedic surgeon who conducted the first medical review of this claim on Banner's used to treat certain types of knee injuries. To quote Dr. Court, it is supported by several well-accepted published peer review articles of improved functions and outcomes. And Dr. Court's report can be found in the appellate's appendix at volume two, beginning at 495. Dr. Court confirmed specifically that the procedure is not experimental. It's part mainstream in orthopedic surgery. It is well-respected and performed by well-respected facilities throughout the country and has been proven effective on peer-reviewed articles. The issues in this case, however, go beyond simply this. Let me ask you about what you mean by effective. Because I thought the data indicated that it often had to be repeated. There were adverse effects of the surgery. It often didn't help that much. What's your standard for effectiveness? Can you give any objective criteria for determining what it means to be effective in your view? Based on Dr. Court's report, he indicated that the peer-reviewed medical literature did show that it was effective to treat the condition, although certainly not by any means foolproof. With any medical procedure, there are risks, there are possible complications. But nonetheless, for Dr. Court, an accepted procedure. I believe the second medical exam cannot identify the reviewer, as he's not actually identified in the record, did acknowledge the same, including that several well-accepted recent published peer-reviewed articles in cases in a case series of improved function and approved outcomes following the ACI procedure. He recognizes in the studies that he noted in his report, that certainly in terms of short and midterm studies, do support the efficacy of the procedure. Do you agree, counsel, that the administrator in this case has discretion given to him by the plan? Yes, your honor. The summary plan description does indeed contain broad discretionary language and consistent with this court's recent holding in the Lynn M. Primera insurance case, was provided, notice of that was provided to plan members like Ms. Weiss. We therefore acknowledge that the arbitrary and capricious standard review applies. I'll ask you one real quick question before we leave the effectiveness of treatment area. Does it matter in considering what is sufficiently effective treatment, whether there are other treatment options? Because I know in the denial letter here, it said, please continue to follow up with Dr. Gersoff for other options, but she's too young for a available option. Does that matter as far as measuring effectiveness? Certainly matters to Ms. Weiss, your honor. I believe Dr. Court echoed that sentiment that based on the standards and protocols for the procedure, she would meet all accepted criteria. In terms of... Judge Phelps makes an important point, but also included would be how effective it is. And when you say peer reviewed, are they just one surgeon reporting that surgeon's results and that surgeon's evaluation, or are these other types of studies? And the figure that I found most remarkable as a negative is quoted on page seven of the insurer's brief. And it says a review of the surgery quote, found an overall failure, I'll paraphrase, an overall failure rate of 5.8%, reoperation rate of 33% with 90% of studies being scored as poor. And what... Judge Hartz, I'm sorry. Yes. I'm sorry, what'd you... You were so far away from your mic that I couldn't hear what you just said. Oh, that's... You're probably lucky. I leaned over to read. This is from page seven of the appellee's brief. There's some bullet points and I'll paraphrase the last one, but I think paraphrase accurately that a review of the surgery found an overall failure rate of 5.8%, a reoperation rate of 33% with 90% of studies being scored as poor. Now, what is your response to that data, to those data? And I believe the data that you're referring to, Your Honor, comes directly from the edition, I believe from 2011 of the Macmillan Care Guidelines that ultimately Banner used as dispositive evidence of whether or not the procedure was effective or not, or medically necessary to track the language of the plan. What's absent from the record from Banner's analysis or from the district court's analysis is any attempt by the medical reviewer or by Banner as the administrator of the plan to distinguish between that data that you've cited and the other data recognized by doctors court and submitted by Dr. Gershoff that found the procedure was effective. One of the cornerstones of ERISA is that it requires principled, reasoned decision making. Without any attempt whatsoever to reconcile the differing opinions, it could not satisfy the standard for an arbitrary standard. How would you suggest that a judge looking at two different approaches, both of which some people agreed was good, and one is chosen? How is a judge to say, well, you should have done something different when there's discretion given to the administrator? Yes, Your Honor. Under the arbitrary and capricious standard of review, the court's task today is not to determine what would be the best outcome, but the court's task is to decide whether or not the record reflects that there was substantial evidence to support the ultimate decision and whether it was rational or not. What we don't have in this record is any actual- If somebody reads the statistics that Judge Hart's read from the MCG, which is a very well-recognized research tool and comes up with a decision, how can that be wrong? Well, it can be arbitrary and capricious, Your Honor, when instead of applying- If two people say it's good and two people say it's bad, the arbitrator or the administrator can legitimately choose one or the other, can he not? An administrator can apply the language of the plan, and the plan language in this case specifies that they will examine medical records, protocols, and authoritative medical literature. What happened in practice, for all practical purposes in this case, much as what happened in the Lynn M case, is that the administrator directed the second medical review to apply the as a dispositive standard under this plan, and that is contrary to the plan language, which does not indicate or reference anywhere that the MacMillan CARE guidelines are the dispositive standard for review or determination of medical necessity under this particular plan. One needs only look at the three separate decisions made in this case. The first two specifically provided the only rationale that we rely on the MacMillan CARE guidelines to make medical decisions, to the extent that they ignored the opinion of their own mandatory medical review dictated by ERISA. The denial letter mentions that a medical review was done, and then simply disregards without discussion the results of that review, instead saying we apply the MacMillan CARE guidelines. Go ahead. Sorry. Is it arbitrary and capricious, then, unless the administrator refutes all of the competing views? Because certainly the Medical Review Institute acknowledged that there were those other views, and does it really need to go through and dispute them point by point, Dr. Gersoff or any others? I think what ERISA requires, Your Honor, is at least a rational discussion of the competing views and why one was chosen over the other, which is absent from this record. There's essentially an acknowledgment of the contrary conclusion and then no discussion as to why the data from the MCPN or from the MacMillan CARE guidelines was being utilized in lieu of the other peer-reviewed authoritative materials that were submitted by the first IME, who concluded this was a effective non-experimental and established procedure, and Dr. Gersoff, who also advocated that position, again providing underlying medical literature. But there can be differences between literature, and maybe it would be helpful to better understand, perhaps I have a misconception of what the MCG does. There will be lots of reports. A surgeon will say, I did this and I got great results, and that'll be published. That's important for people to know. But then some other institution, and I gather this is what the MCG does, but I may be wrong, it goes through all the literature and looks at all the studies that and says, some people report good results, but when we look at the data overall, we get these results. And wouldn't that be a much more reliable source than that of an individual surgeon reporting that surgeon's results? Well, your honor, based on the record that's available, it's very difficult to tell exactly what the Macmillan Care Guidelines are. There's no reference to it in any policy manual. The full guidelines are not even included in the record. There's simply a three-page excerpt that Banner instructed its reviewing medical physicians to apply as a standard under the plan, contrary to the actual plan language. We don't have anything in the record to show how the MCG prepares its reports. I don't believe other than the three or four pages specific to the ACI, there's any other additional materials about the Macmillan Care Guidelines included in the record. Thank you. While as there is a another significant issue that must be addressed, your honors, in terms of the statute of limitations, with the court's permission, I'd like to leave my brief remaining time for rebuttal. Thank you, counsel. Mr. Hardy. May it please this court. There are two issues presented for review today. First, this court should affirm the decision of the district court determining that Banner Health properly decided that its health and welfare benefit plan did not provide coverage for Ms. Weiss's claim for chondrocyte implantation or ACI. And second, this court should reverse the district court opinion that the one-year limitations provision in the plan did not bar Ms. Weiss's lawsuit, which was filed nearly two years after her final decision on appeal. I address each of these issues in turn. As to the first issue, Ms. Weiss on appeal essentially makes two arguments. One, that Banner Health could not rely on the Milliman Care Guidelines in determining that the ACI procedure did not meet the definition of medically necessary as defined under the plan. And two, even if Banner could rely on Milliman, it failed to consider other evidence submitted with her claim and therefore acted arbitrarily and capricious in its evidence. First, the plan does not limit the type of information Banner can review when deciding whether a procedure meets the definition of medically necessary. While the plan does not refer specifically to Milliman, it states that the list of potential resources is not exclusive. While Ms. Weiss is critical of Milliman, objectively it is well recognized in the healthcare industry as providing evidence-based criteria for determining the medical necessity of procedures. Let me just ask, oh go ahead please. No, no I think go ahead Judge Phillips. All right, my concern that perhaps you could address is not with Milliman so much as Banner picking and choosing depending on every case that comes through and different conditions what's medically necessary and say the next case involves a different condition and Milliman suggests that it's effective treatment. Can Banner just ignore Milliman for that one and go find a different group that says it's ineffective? Do you see what I'm saying? Can it just hop around until it finds someone who agrees with it, deny coverage, especially when there's a conflict of interest? Yes, your honor. Well, I think it's interesting that Banner is in the healthcare industry. It runs hospitals and employs doctors so I think it's particularly appropriate that it's relying on Milliman as this industry standard and if you look at the guideline itself, I mean it cites several references. I think there was some several end notes, I believe more than 20 in terms of how it compiles or reviews literature to compile the information therein. That's in the record? Those end notes? Yes, that your honor is in the record. The Milliman care guidelines at issue are at the record 372 through 375 and those end notes are listed starting at 373. And those that it does sort of a meta-analysis, is that right? There are several references. I'm looking at the guidelines. There are 20 references and again I think there was some compiled and it references the literature that brings it to the decision or the compilation of information set forth in the guideline itself. Okay, but now returning to Judge Phillips' question, is there something that should give us comfort that Banner is not being arbitrary in when it refers to the Milliman guidelines because it only refers to it when it forbids coverage? I hope I'm addressing the question. It's recognized, it's generally recognized in the industry. I don't think there's any evidence here of cherry picking where it uses it sometimes but not other times. There's no evidence of that. There was no discovery sought to explore that issue. The only evidence in the record is that that's what Banner relies upon. Notably, there are several many cases around the country as referenced by the district court that find Milliman appropriate to rely upon in these situations. Also of note is that Milliman is particularly applicable here because the issue is not whether Ms. Weiss should be allowed to have the surgery because of her condition. It's the procedure itself, whether the efficacy of the procedure and whether it is well recognized. That makes Milliman particularly established in terms of that more objective question than whether it applies specifically to her. I think Milliman was appropriate in this regard. The second issue brought up by Ms. Weiss to address that is that Banner did not exclusively rely on Milliman to the exclusion of other evidence submitted with the claim. This is established by the record and particularly the external review that was performed. Ms. Weiss argues that Banner ignored its own doctor's opinion who believed that the claim should be approved from quote an orthopedic standpoint end quote. However, it did not ignore this opinion. Instead, Banner ultimately disagreed with it given several caveats expressed in Dr. Banner's report including that he had never performed the procedure, cartilage procedures had variable results, and he could not address the terms of the plan because he had not reviewed them and felt it was outside his area of expertise. He even cautioned that Ms. Weiss should have to be informed and educated regarding the variable results and risks associated with the ACI procedure. Nothing in the plan stated that Banner had to merely take Dr. Kort's orthopedic opinion and ignore his other statements or other information available including the plan language and Milliman in making its decision. The external review also establishes that all evidence was considered in ultimately denying the claim. The external review physician was letter. The physician stated that the proposed ACI procedure was not medically necessary based on both Milliman and the plan language. In the external review letter, the doctor summarized Ms. Weiss's medical records and history. The letter referenced the plan's definition of medically necessary and specifically determined that the criteria that the procedure be medically proven to be effective treatment of the condition was not satisfied based upon the lack of studies and published peer review literature. The letter also cited several additional medical literature references in support of the decision. Based upon this and as examined by the district court, the record simply does not support Ms. Weiss's argument that Banner only relied on Milliman and ignored all other evidence. As to the second issue for review on appeal, this court need only reach the contractual limitations matter if it does not affirm the district court on the first issue on appeal. The plan clearly contains a one-year contractual limitations period to file a lawsuit. Isn't that for internal appeals? And doesn't the SPD specifically explain the participant's right to bring a civil action under ERISA would be explained and the time would be explained? And they didn't do that. Your Honor, the plan states that, and I'm paraphrasing, the participant may bring a legal action only if the action is commenced within one year after a final decision on appeal is made. Did Banner send a letter denying the claim and stating in the letter, as they suggested they would do in the SPD, that there was a one-year limitation? No, it did not. Thank you. That only applies, Your Honor, to the summary plan description, as you pointed out, to the first level appeal. It does have that requirement that Banner should put that time limitation in the letter, and it did not. However, that limitation does not apply to the external review. Where does it specifically state that any limitation does not apply if we deny the benefit on the final review? So, if you go to the summary plan description, there is a separate section for external review. And in that section, it states what that review letter should contain. And therein, Your Honor, there is no reference to the one-year contractual limitations. That's right. And that's why you're supposed to give the insured notice in the letter denying the claim. Well, Your Honor, it's... What's our rule on interpreting insurance contracts? In favor of the company or in favor of the insured in the event of ambiguity? Well, this isn't an insurance contract, Your Honor. It's non-insured benefits. It's a self-funded plan. So, I don't believe that insurance interpretation would apply to this situation. However, again, there's a distinction between what the plan requires in terms of when the one-year period begins to run, again, from a final decision on appeal versus what the summary plan description requires, which is notice of that as to the first level appeal, but not as to the external review. And that's stated in a letter that you sent to the insured or to the Ms. Weiss. The external letter complies with the requirements set forth in the summary plan description. It did not have to state the one-year contractual period. And that's because it was dealing with... the one-year was dealing with internal issues? The one-year statute, excuse me, the one-year external review date. However, the external review letter did not have to mention that contractual limitations period. Why not just do it instead of coming into court and rolling us through all of this? It's not an ink expenditure. You can do it in probably one sentence. Why should we encourage more of this instead of just saying, tell them? Well, it's in the plan document, Your Honor. And certainly in terms of the first level review, it was not in that letter, but that requirement does not apply to the external review. And also... Does it say that in the SBD? Does it say specifically, this does not apply to the external review? You're on your own. It does not state that negative, Your Honor, but it does list the requirements of what the external review letter should include. And it does not list the contractual limitations. I hope you're getting the message. If you talk to your people and just say, Yes, Your Honor. It's fair. It's fair. Might as well do it. We'll see what effect it has in this case, but for future work, it's just not fair. Well, Your Honor, that brings us to the Code of Federal Regulations. And that tells what plan administrators should put in their letters and not. And there was discussion in the briefing about the 503-1G and whether that requires putting in a letter the contractual limitations period. Well, that applies to initial denials, not denials on appeal. And that's this court's decision in the Hancock versus MetLife case that recognized that distinction. You're making a legal argument saying you don't have to under the CFR. You can do more than what you have to, and we'll decide whether you had to, perhaps in this case. But, okay, your time has expired. Mr. Bolger, you have a minute left, I think, something like that. 52 seconds. Thank you, Your Honor. To cut to the chase, so to speak, in terms of the statute of limitations argument, in five separate briefs now, the banner has focused on what phase of the proceeding does this notice have to be given per the terms of the summary plan description. Absent from the record, and what Judge Daniels specifically found, was that there is no letter at any stage, the original denial, after the, or before the external review, or in the final regardless of what phase of the process Banner now argues it should have been given, it simply wasn't. Turning to the merits, Your Honor, Judge Phillips, I believe you hit on the primary theme, the big issue in this case. There is no evidence that Banner uses this bill and care guidelines as a matter of policy or standard. It's not referenced in the policy, there is no claim manual, not in the summary plan description of the plan language. They're free to pick and choose when they want to use it. Thank you, Your Honor. Thank you, counsel. Case is submitted. Counsel are excused.